# CASES

## ARGUED AND DETERMINED

### IN THE

# United States Circuit and District Courts.

---

## BARRY *v.* MISSOURI, K. & T. RY. Co. and another.

*(Circuit Court, S. D. New York. March 22, 1886.*

1. CIRCUIT COURT—JURISDICTION—CITIZENSHIP—TRUSTEE OF INCOME MORTGAGE NOMINAL DEFENDANT.

   A., the owner of certain coupons and scrip certificates of unpaid interest owing by a foreign railroad corporation upon bonds secured by an income mortgage, in behalf of himself and other owners of coupons and certificates, filed a bill in the circuit court against the railroad company, and the Union Trust Company, a citizen of the same state as himself, which was the trustee named in the income mortgage, to compel an accounting, and for an injunction against the appropriation of the earnings of the railroad company contrary to the rights of the income bondholders, and for a decree for the payment of the income applicable to the interest, averring that the trust company was made defendant because it asserted that no duty was imposed on it in respect to the matters involved in the suit, and had refused to bring suit when requested so to do. *Held*, that the circuit court had jurisdiction.

2. RAILROAD COMPANY—MORTGAGE BONDS—"NET EARNINGS" DEFINED.

   As a general proposition, the "net earnings" of a railroad company are the excess of the gross earnings over the expenditures defrayed in producing therein, aside from, and exclusive of, the expenditure of capital laid out in constructing and equipping the works themselves.

3. SAME—MORTGAGE OF MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

   The expenses defrayed or incurred in producing the earnings for a given interest period are the only charges which can enter into the income account for that period, except the payment of interest on prior incumbrances, as stipulated by the terms of the mortgage; and the company cannot charge against income, for any period during the life of the mortgage, a payment or a liability incurred on account of old indebtedness existing before the mortgage was created, or arising from a loss incurred by the sale of bonds issued to pay off old indebtedness.

4. SAME—ACCOUNTING—INTEREST.

   Where a mortgage is executed by a railway company to a trustee, conditioned for the payment of interest upon the bonds secured by the mortgage at semi-annual periods out of the surplus earnings of the company, the mortgagor owes a duty to the bondholder to keep such an account of its earnings and expenses as will show the net results of each interest period, and the trustee owes an active duty to the bondholders in the supervision of the account.

v.27 F.no.1—1

5. SAME—APPLICATION OF INTEREST ON COUPONS.
 Where the bonds are coupon bonds, and such an account has not been kept for a series of years, upon an accounting the holders of coupons are entitled to have the interest earned during each interest period applied upon the coupons representing that period.
6. SAME—ACCOUNTING.
 Mortgage and bonds construed, and manner of accounting directed.

In Equity.
*Anderson & Man,* for complainant.
*Dillon & Swayne,* for defendant.

WALLACE, J. The complainant is the owner of coupons and scrip certificates representing $43,462 of unpaid interest owing by the defendant the Missouri, Kansas & Texas Railway Company upon bonds secured by an income mortgage created by it April 1, 1876. He has filed this bill on behalf of himself, and all other owners of coupons and certificates who may desire to join, to compel an accounting by the railway company of its earnings and operating expenses since the making of the mortgage. The bill prays for an injunction against the appropriation of the earnings contrary to the rights of the income bondholders, and for a decree for the payment of the income applicable to the interest. The defendant the Union Trust Company of New York is the trustee named in the income mortgage, and the bill avers that this corporation is made a defendant because it asserts that no duty is imposed on it in respect to the matters involved in the suit, and has refused to bring suit after request on behalf of the complainant and others similarly situated. No relief is sought against the trustee, and it has not answered or appeared in the suit.

The question is presented preliminarily to a consideration of the case upon its merits whether this court has jurisdiction, the complainant and the defendant the Union Trust Company (a New York corporation) both being citizens of this state. The Union Trust Company is a necessary party to the suit, and this has been so determined by this court when the case was before it on a former occasion upon a demurrer to the bill of complaint and the Union Trust Company. No relief is sought against this defendant by the complainant. Its interests and those of the complainant are not adverse, but are identical. In *Pacific R. R.* v. *Ketchum,* 101 U. S. 289, 298, the court held that the trustees of a mortgage which was being foreclosed at the suit of bondholders might properly be arranged on the same side of the controversy about the foreclosure with the complainants, although they were nominal defendants, because there was no antagonism between them and the complainants, and no relief was asked against them. To the same effect is the case of *Arapahoe Co.* v. *Kansas Pac. Ry. Co.,* 4 Dill. 277. These authorities are decisive of the jurisdictional question.

Upon the merits, the questions in the case are (1) whether the mortgagor has failed to apply net or surplus earnings to the payment

of interest upon the bonds; (2) whether the holders of scrip certificates stand in the place of holders of coupons, and are entitled to payment from the surplus earnings; (3) whether the earnings are applicable *pro rata* upon all the coupons unpaid, or only to such as fall due during the period in which earnings were realized that should have been applied to the payment of interest.

The income mortgage was created to secure a series of bonds for the sum of $1,000 each, amounting in the aggregate to $10,000,000. Each bond recites that the railway company "is indebted to the Union Trust Company of New York, or bearer, in the sum of one thousand dollars, which the said railway company promises to pay to bearer on the first day of April, 1911, in the city of New York; and from the net or surplus earnings of said railway company to pay, according to the terms of the trust deed or mortgage hereinafter mentioned, interest thereon semi-annually, at the rate of 6 per cent. per annum, at its office in the city of New York, on the first days of April and October in each year, upon the presentation and surrender of the coupons hereto attached as they severally become due; and in case of default in the payment of any of the interest coupons attached to this bond in the manner provided in the said trust deed or mortgage, then, and in that case, the principal sum of this bond shall become due in the manner and with the effect provided in the said trust deed or mortgage." The bond then recites that "the whole series of bonds are secured by a trust deed or mortgage conveying in trust the corporate property, real and personal, land grants, and the franchises and privileges belonging to, or hereinafter to be acquired by, the railway company;" and continues as follows: "The entire income of said property, after the payment of the expenses of operating and keeping the said railway and property in repair, and of the interest on the incumbrances prior hereto, which are more fully set forth in said trust deed or mortgage, is pledged to the payment of these bonds, and the interest thereon, in the manner set forth in said trust deed or mortgage."

The mortgage, the terms of which are thus by reference incorporated into the bonds, enumerates in article second the prior incumbrances upon which interest is to be paid before income applicable to the payment of interest on the bonds is to arise. They amount in the aggregate to $19,082,000.

The third article of the mortgage recites the promise to pay as recited in the bonds, with the following additional clause:

"And in case at any time the said net or surplus earnings so remaining as aforesaid shall not be sufficient to pay the interest on said bonds as the same becomes due and payable, the said party of the first part [the railway company] shall issue to the holder of the coupons or interest warrants of said bonds a scrip certificate, payable only from the net or surplus earnings of said party of the first part, and which, with interest thereon at the rate of six per cent. per annum, shall be redeemed and paid by said party of the first part before it shall declare or pay any dividend upon its capital stock."

The sixth article of the mortgage recites the promise to pay interest in somewhat different terms from the language of the bond and of the third article of the mortgage, and reads as follows:

"The said party of the first part hereby further agrees that it will pay, or cause to be paid, the said bonds issued and secured by this mortgage, and that it will pay the interest thereon semi-annually, in lawful money, from its net or surplus earnings: * * * provided, said net or surplus earnings shall be sufficient therefor; and that in case its said earnings in any six months shall be insufficient therefor, then for any such deficit said party of the first part agrees to issue a scrip certificate, redeemable, with six per cent. interest, before any dividend shall be declared upon the stock of said company."

The seventh article of the mortgage authorizes the trustee, in case of the neglect of the mortgagor to pay any interest due upon the bonds, and after such neglect shall continue for one year after the interest has been demanded, to enter upon the property, and hold, use, and operate the same until a sale thereof pursuant to the power of sale contained in the mortgage, and to apply the moneys accruing, after deducting the expenses of operating and managing the property, to the payment of the bonds *pro rata*.

The eighth article of the mortgage contains the usual power of sale of the property and franchises, in case of a neglect on the part of the mortgagor to pay the interest upon the bonds, and provides that in case of sale the proceeds shall be applied to the payment of the principal and interest of the bonds unpaid *pro rata*.

It appears by the proofs in respect to the surplus earnings of the company that during the period beginning April 1, 1876, and ending January 1, 1885, there was charged by the company against earnings in its net income account, among others, certain disputable items, amounting in the aggregate to $3,784,336. If these items are not properly chargeable against the income, the result would be that surplus earnings arose during that period of time to the amount of $2,073,662, being net profits from the business of the company applicable to the payment of the interest upon the bonds beyond the payment of interest on prior incumbrances and the expenses of maintaining and operating the property. Of these items, one of $255,275 is for unpaid indebtedness which had accrued against the company before the income mortgage was created; another of $1,593,-665 is for the difference between the face of the income bonds and the sum realized upon them (80 cents on the dollar) by the company; another of $1,398,935 is for interest on prior incumbrances which the company has not paid, and which the complainant alleges the company is under no obligation to pay; and the other items are likewise for interest for which the complainant alleges the company was not liable.

Respecting the disputed items for interest, it appears by an agreement forming part of the income mortgage that this mortgage was created in order to fund unpaid interest upon existing mortgages of

the company, and to pay off certain other mortgage bonds and the creditors at large of the company. The holders of the first mortgage bonds, the holders of junior mortgage bonds, and the creditors at large, together with the railway company, were parties to the agreement. By the terms of the agreement the holders of the first mortgage bonds were to accept the income bonds which were to be created at 80 cents of their face value, in payment of their unpaid interest; and agreed to reduce their interest for the ensuing six years to 4 per cent. per annum for the first three years, and to 5 per cent. for the last three years, and to accept the income bonds in payment of the difference between the original and reduced rate of interest. The agreement also provided that if at any time the surplus earnings of the railway company should be more than sufficient to pay the interest on the first mortgage bonds at the reduced rate for the six years, and in addition thereto the interest upon the income bonds, the excess of the net earnings should be applied to increase the payment of interest on the first mortgage bonds up to the full amount originally payable thereon.

Unquestionably the bondholders are entitled to an account of the earnings, and the sums charged against the earnings, for each six months from the date of the mortgage, if the proofs justify the conclusion that surplus income has been earned after deducting all payments or liabilities which were legitimately charged against the income during the period of the earnings. The inquiry is whether there is any remainder of earnings after the payment of operating expenses, repairs, prior interest, taxes, etc. It is not essential that the company shall have actually paid the disbursements which arise from these sources during the period of the earnings; it suffices if the company has become liable to pay them, although the time of payment may have been deferred. The expenses and liabilities incurred for the maintenance and operation of the road, and for interest on prior liens during each interest period, are to be charged against the income for that period. The term "net earnings" is defined in the opinion of the court in the case of *Union Pac. R. Co.* v. *U. S.*, 99 U. S. 420, as follows: "As a general proposition, net earnings are the excess of the gross earnings over the expenditures defrayed in producing them, aside from, and exclusive of, the expenditure of capital laid out in constructing and equipping the works themselves." The expenses defrayed or incurred in producing the earnings for a given interest period are the only charges which can enter into the income account for that period, except the payment of interest on prior incumbrances, as stipulated by the terms of the mortgage. Applying this rule, it is preposterous to assert that the company could properly charge against income for any period during the life of the mortgage a payment or a liability incurred on account of old indebtedness existing before the mortgage was created, or arising from a loss incurred by the sale of bonds issued to pay off old indebtedness. It might,

with equal propriety, seek to offset its whole funded debt against its income.

It is difficult to understand upon what theory the company assumes the right to charge against income items for interest, some of which has not been paid, and all of which has been discharged to the company by the agreement of the holders of the incumbrances. The company has assumed to charge against the income account the difference between the rate of interest which the first mortgage bondholders agreed to accept for six years and the original rate to which they would have been entitled if the agreement had not been made. The terms of the agreement are so plain that it does not seem possible to misconceive its effect, which was, as was intended, to substitute a reduced rate for the original rate for six years, unless a surplus should arise after the payment of the interest on the income bonds. When the holders of the first mortgage bonds received the income bonds the agreement was fully executed. In the face of this agreement the company undertakes to charge against income, not only the difference between the original and the reduced rate which it has paid to the bondholders for the last two of the six years, but also the difference for the first four years, which has not been paid, but has been funded, and is now represented by the income bonds.

It has been suggested for the company in the argument of its counsel that sanction is found for the position of the company in an adjudication in the suit between the company and the Union Trust Company, in the circuit court of the United States for the district of Kansas; but it is not apparent from the record in that case that any such question as is now presented was directly or indirectly in issue, or was considered by the court.

It is also insisted for the railway company that it can properly charge against earnings the sums required to be set apart annually for a sinking fund under the provisions of the first mortgage; that the company is in arrears nearly $2,500,000 in its appropriation for this sinking fund; and that, deducting this amount from its gross earnings, there is no net income applicable to interest on the bonds. This mortgage has not been put in evidence, but, assuming its provisions to be as stated in the brief of counsel, the sufficient answer to the contention is that the obligation of the company to the income bondholders is in explicit terms to appropriate all its earnings to the payment of interest upon the income bonds except such as are to be devoted to the expenses of operating and keeping in repair its railway and mortgaged property, and to the payment of the interest on the prior incumbrances. Disallowing the items which have thus been improperly charged against the income account, there is apparently a considerable sum arising from net earnings which should be applied to the payment of the interest on the income bonds.

It remains to consider the principles upon which the accounting should proceed, and this involves an interpretation of the income

mortgage in order to ascertain what is the obligation of the railway company to the bondholders respecting the payment of interest, and what are the rights of holders of coupons and of the scrip certificates. The mortgage creates a pledge during the 35 years between its date and the time of the maturity of the bonds of so much of the net earnings of the railway company—that is, the income after paying the expenses of operation and maintenance, and interest on the prior incumbrances—as may be necessary to pay the interest upon the income bonds. This interest is to be paid at specified semi-annual periods. The promise of the bond is to pay the principal at maturity, and to pay the interest semi-annually, at the rate of 6 per centum, "from the net or surplus earnings;" but in article 6 of the mortgage this promise is further qualified so as to expressly restrict the obligation of the company to pay interest, "provided said net or surplus earnings shall be sufficient therefor." Consequently, unless within some one of the six-months periods between the date and the maturity of the bonds net income is realized, the company is not in default, and is under no present obligation to pay interest. By the third article of the mortgage it is provided that in case, at any time, the surplus earnings shall not be sufficient to pay the interest as it matures, the company shall issue to the holders of interest coupons "a scrip certificate, payable only from the net or surplus earnings of the company," carrying interest at the rate of 6 per cent., which shall be redeemed and paid by the company before it shall declare any dividend to its stockholders. This provision, as well as the language of the bond itself reciting a pledge of the entire income of the property to the payment of the interest on the bond, clearly indicates that although the payment of all interest not earned within any of the interest periods is to be postponed until a future day, nevertheless it is to be paid whenever there is net income applicable thereto. It is not only to be paid when there is a fund applicable to its payment, but it must be paid before any dividend can be declared by the company to the stockholders. The declaration of a dividend would conclude the company from controverting the existence of the fund. Under the terms of the eighth article of the mortgage the certificates, which represent interest payable but not earned, stand upon the same footing as the principal of the bond, and are to be paid out of the proceeds of the sale of the property, or, if the proceeds are not sufficient for the payment in full, are to be paid *pro rata.*

According to the scheme of the mortgage, as denoted by the several provisions referred to, the surplus earnings of each interest period belong to the holders of coupons for that period. If the earnings are insufficient to pay the interest in full, the holders are entitled to scrip certificates for the residue; if the net earnings more than suffice to pay the interest for the six months, the surplus falls into a general fund for the payment of holders of scrip certificates ratably; if there are no net earnings until an exercise of the power of sale un-

der the eighth article, the unearned interest becomes principal, and is to be paid as principal out of the proceeds of the sale. The coupon-holders have the first lien upon the surplus earnings for the period represented by their coupons, but as to earnings from any other period they have only the rights of certificate-holders; and whether they surrender their coupons or not, if the earnings are insufficient to pay the interest in full they stand as certificate-holders for their interest unearned. It has been suggested that the surrender of a coupon, and the acceptance of a scrip certificate in lieu, is a release of any claim by the coupon-holder upon the surplus earnings of the interest period represented by the coupon. But, as has been stated, the obligations of the company towards the coupon-holder, and his lien upon the surplus earnings, are the same whether he surrenders his coupon or does not. If he does not surrender it, the unearned interest which it represents is solvable by a certificate, and his lien upon the income is restricted to such as arises during the interest period of his coupon. If he does surrender it, there is no new consideration to support a release of interest which belongs to him, or of his lien upon the income for it. If he accepts a certificate for his coupon, he does so upon the representation of the company that there are no net earnings applicable to the present payment of his interest. If this representation is a falsehood, the coupon-holder cannot be prejudiced by it. Every certificate, according to the true construction of the mortgage, represents the unearned interest of the period of a particular coupon or set of coupons; and the coupon-holder and the certificate-holder stand in the same category of creditors, and are entitled to be paid *pro rata* out of the earnings of the interest period represented by their coupons or scrip.

By reason of the obligation of the company, as expressed in the bond and mortgage, to devote the net income semi-annually to the payment of interest, a duty arises by implication, and rests upon the company, to keep such an account of its earnings and its expenditures as will show the net income of each semi-annual interest period applicable to the payment of the interest. The company has not attempted to fulfill this duty, and the trustee for the income bond-holders has apparently supinely relinquished to the officers of the railway company the supervision of the accounts which the trustee should have exercised itself. The railway company now produces an account of its income and expenditures, not divided into income periods, but covering a series of years in which there are charges against earnings so palpably unwarranted as to suggest the inference that its officers have strained their ingenuity to conceal a fund which it was their duty to pay over to the bondholders of the bonds. If upon such an accounting as the railway company will be directed to make it should appear that so large a sum has been withheld as there is now reason to suppose, it may become the duty of the court to appoint a receiver to protect the interests of the bondholders which seem to

have been so inadequately protected by the trustee. It is not necessary, however, to decree at present any further relief than such an accounting as will afford the proper basis of a final decree appropriating any sum found due according to the rights of the holders of coupons and certificates.

A decree is ordered directing an accounting by the railway company before a master respecting its earnings and income for six months from the date of the mortgage, and its expenses during the same period for operating and keeping in repair its railway and property, as well as of the sums paid, or which it is liable to pay, for the interest upon the incumbrances prior to the income mortgage specified in the instrument, and for taxes and assessments. Upon such accounting the railway company is to be disallowed any sums paid or charged on account of debts which it had contracted prior to the creation of the income mortgage; is to be disallowed any charge against income arising from the sale of its income bonds at a price less than their face amount; and is to be disallowed any interest upon the first mortgage bonds which it has not actually paid, or become liable to pay, and all which has been funded and is now represented by the income bonds accepted by holders of the first mortgage bonds in lieu of interest. The master will ascertain how much net or surplus earnings have been made by the company during each six-months period, to the time of the filing of the bill. The master will also ascertain the amount of coupons converted into scrip certificates, and the interest periods represented by the certificates, respectively, to the end that it may be finally decreed that the net income of each interest period shall be paid ratably to the holders of coupons or certificates representing interest for the same six months.