11-5171(L)
Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2014

Nos. 11-5171, 11-5466, 13-2339, 13-2777

CITIZENS AGAINST CASINO GAMBLING IN ERIE COUNTY, JOEL ROSE and ROBERT HEFFERN, as Co-Chairpersons; D. MIN. G. STANFORD BRATTON, Reverend, Executive Director of the Network of Religious Communities; NETWORK OF RELIGIOUS COMMUNITIES; NATIONAL COALITION AGAINST GAMBLING EXPANSION; PRESERVATION COALITION OF ERIE COUNTY, INCORPORATED; COALITION AGAINST GAMBLING IN NEW YORK-ACTION, INCORPORATED; CAMPAIGN FOR BUFFALO-HISTORY ARCHITECTURE & CULTURE; SAM HOYT, Assemblyman; MARIA WHYTE; JOHN MCKENDRY; SHELLEY MCKENDRY; DOMINIC J. CARBONE; GEOFFREY D. BUTLER; ELIZABETH F. BARRETT; JULIE CLEARY; ERIN C. DAVISON; ALICE E. PATTON; MAUREEN C. SCHAEFFER; JOEL A. GIAMBRA, Individually and as Erie County Executive; KEITH H. SCOTT, SR., Pastor; DORA RICHARDSON; and JOSEPHINE RUSH,
*Plaintiffs-Appellants-Cross-Appellees,*

*v.*

JONODEV OSCEOLA CHAUDHURI, in his official capacity as Chairman of the National Indian Gaming Commission; THE NATIONAL INDIAN GAMING COMMISSION; SALLY JEWELL, in her official capacity as Secretary of the Interior; and THE UNITED STATES DEPARTMENT OF THE INTERIOR,

*Defendants-Appellees-Cross-Appellants.*[*]

Appeal from the United States District Court
for the Western District of New York.
Nos. 06-cv-001, 07-cv-451, 09-cv-291 — William M. Skretny, *Judge*.

ARGUED: JANUARY 16, 2015
DECIDED: SEPTEMBER 15, 2015

Before: KATZMANN, *Chief Judge*, LOHIER and DRONEY, *Circuit Judges*.

The plaintiffs, organizations and individuals who oppose the operation of a casino on land owned by the Seneca Nation of Indians in Buffalo, New York, filed an action in the United States District Court for the Western District of New York against the National Indian Gaming Commission, its Chairman, the Department of the Interior, and the Secretary of the Interior, arguing that the National Indian Gaming Commission acted arbitrarily and capriciously and abused its discretion in approving an ordinance that permitted the Seneca Nation to operate a class III gaming facility in Buffalo. The district court (Skretny, *J.*) dismissed the action, and the plaintiffs appealed. We hold that the Seneca Nation's lands in Buffalo are gaming-eligible under the Indian Gaming Regulatory Act ("IGRA"),

[*] The Clerk of the Court is directed to amend the official caption to conform to the above. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Jonodev Osceola Chaudhuri, the present Chairman of the National Indian Gaming Commission, and Sally Jewell, the present Secretary of the Interior, are automatically substituted as defendants herein for their respective predecessors.

25 U.S.C. §§ 2701–2721, as "Indian lands" under the Seneca Nation's jurisdiction and that IGRA Section 20's prohibition of gaming on trust lands acquired after IGRA's enactment, 25 U.S.C. § 2719(a), does not apply. Accordingly, we **AFFIRM**.

---

CORNELIUS D. MURRAY, O'Connell and Aronowitz, P.C., Albany, NY, *for Plaintiffs-Appellants-Cross-Appellees*.

KATHERINE J. BARTON, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C. (Michael Hoenig, Office of General Counsel, National Indian Gaming Commission, Washington, D.C.; Andrew S. Caulum, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; Robert G. Dreher, Sam Hirsch, Acting Assistant Attorney General; William J. Hochul, Jr., United States Attorney for the Western District of New York, Buffalo, NY; Mary E. Fleming, Assistant United States Attorney, Western District of New York, Buffalo, NY; Gina L. Allery, John L. Smeltzer, United States Department of Justice, Environment & National Resources Division, Washington, D.C., *on the brief*), *for Defendants-Appellees-Cross-Appellants*.

RIYAZ A. KANJI, Kanji & Katzen, PLLC, Ann Arbor, MI (Christopher Karns, General Counsel, Seneca Nation of Indians, Salamanca, NY; Carol E. Heckman, Harter, Secrest & Emery, LLP, Buffalo, NY; David A. Giampetroni, Lucy Wells

-3-

Braun, Philip H. Tinker, Kanji & Katzen, PLLC, Ann Arbor, MI, *on the brief*), *for the Seneca Nation of Indians as* amicus curiae *in support of Defendants-Appellees-Cross-Appellants.*

DRONEY, *Circuit Judge*:

The plaintiffs-appellants ("plaintiffs") are organizations and individuals that oppose the operation of a casino in Buffalo, New York, by the Seneca Nation of Indians. They brought three successive lawsuits in the United States District Court for the Western District of New York against the National Indian Gaming Commission ("NIGC"), its Chairman, the U.S. Department of the Interior ("DOI"), and the Secretary of the Interior. In these three actions, the plaintiffs argued that the NIGC did not act in accordance with federal law in approving an ordinance and subsequent amendments to that ordinance that permitted the Seneca Nation to operate a class III gaming facility—a casino—on land owned by the Seneca Nation in Buffalo ("the Buffalo Parcel"). In the third lawsuit ("*CACGEC III*"), which addressed the NIGC's approval of the most

-4-

recent version of the ordinance, the district court (Skretny, *J.*) denied the plaintiffs' motion for summary judgment and entered judgment dismissing the case.

We hold that the district court correctly dismissed the plaintiffs' complaint in *CACGEC III* because the DOI and the NIGC's determination that the Buffalo Parcel is eligible for class III gaming under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721, was not arbitrary or capricious, an abuse of discretion, or in violation of law. We further hold that Congress intended the Buffalo Parcel to be subject to tribal jurisdiction, as required for the land to be eligible for gaming under IGRA. Finally, we hold that IGRA Section 20's prohibition of gaming on trust lands acquired after IGRA's enactment in 1988, 25 U.S.C. § 2719(a), does not apply to the Buffalo Parcel. Because the gaming ordinances at issue in the first two lawsuits ("*CACGEC I*" and "*CACGEC II*") have been superseded by the most recent amended ordinance, the appeals of

*CACGEC I* and *CACGEC II* are moot. Accordingly, we **AFFIRM** the judgment of the district court in *CACGEC III* and dismiss the appeals of *CACGEC I* and *CACGEC II*.

**BACKGROUND**

This appeal has a long history that, as mentioned above, includes three lawsuits. While much of that background is described here, a more detailed history can be found in the district court's prior opinions in those cases. *See Citizens Against Casino Gambling in Erie Cty. v. Kempthorne*, 471 F. Supp. 2d 295 ("*CACGEC I*"), *amended on reconsideration by* No. 06-CV-0001, 2007 WL 1200473 (W.D.N.Y. Apr. 20, 2007); *Citizens Against Casino Gambling in Erie Cty. v. Hogen*, No. 07-CV-451 (WMS), 2008 WL 2746566 (W.D.N.Y. July 8, 2008) ("*CACGEC II*"); *Citizens Against Casino Gambling in Erie Cty. v. Stevens*, 945 F. Supp. 2d 391 (W.D.N.Y. 2013) ("*CACGEC III*").

## I.  Statutory Background

Understanding the factual and procedural background of this appeal requires familiarity with two statutory schemes: the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, and the Seneca Nation Settlement Act of 1990 ("SNSA"), 25 U.S.C. §§ 1774–1774h.

### A.  The Indian Gaming Regulatory Act

Congress enacted IGRA in 1988 to "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). IGRA established independent federal regulatory authority and federal standards for gaming on Indian lands. *See id*. § 2702(3). It also established the NIGC as a commission within the DOI to monitor gaming and promulgate regulations and guidelines to implement IGRA. *See id.* §§ 2704(a), 2706(b).

IGRA authorizes gaming on "Indian lands," which it defines as (1) "all lands within the limits of any Indian reservation" and (2)

"any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."[1] *Id.* § 2703(4).

Three classes of gaming may be permitted on Indian lands, subject to different levels of regulation. *See id.* § 2710. At issue here is "class III" gaming, which is "the most closely regulated" form of gaming under IGRA. *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2028 (2014). It "includes casino games, slot machines, and horse racing." *Id.*

Indian lands are eligible for class III gaming activities only if those activities are:

(A) authorized by an ordinance or resolution that—

      (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

---

[1] The distinction between lands held in trust by the United States and lands held subject to a restriction against alienation is discussed later in this opinion.

> (ii) meets the requirements of subsection (b) of this section,[2] and
>
> (iii) is approved by the Chairman [of the NIGC],
>
> (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
>
> (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect.

25 U.S.C. § 2710(d)(1). In this way, IGRA "seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003).

Section 20 of IGRA, however, prohibits gaming "on lands acquired by the Secretary [of the Interior] in trust for the benefit of an Indian tribe after October 17, 1988," the date of IGRA's

---

[2] Subsection (b) provides that "[t]he Chairman [of the NIGC] shall approve any tribal ordinance or resolution concerning the conduct[] or regulation of class II gaming on the Indian lands within the tribe's jurisdiction if [certain conditions are met]." *See* 25 U.S.C. § 2710(b)(2). The additional conditions listed in subsection (b) are not at issue on this appeal.

enactment. 25 U.S.C. § 2719(a). This prohibition is subject to some exceptions, including one of relevance here for subsequently acquired "lands [that] are taken into trust as part of . . . a settlement of a land claim." *Id.* § 2719(b)(1)(B)(i).

**B.      The Seneca Nation Settlement Act of 1990**

**1.      The Seneca Nation of Indians**

The Seneca Nation of Indians is one of the Six Nations of the Iroquois Confederacy. *See Banner v. United States*, 238 F.3d 1348, 1350 (Fed. Cir. 2001); *Seneca Nation of Indians v. New York*, 206 F. Supp. 2d 448, 458 (W.D.N.Y. 2002), *aff'd*, 382 F.3d 245 (2d Cir. 2004). Prior to the colonization of North America, the Iroquois Confederacy occupied approximately thirty-five million acres of land east of the Mississippi River, mostly in modern-day New York and Pennsylvania. *See Banner*, 238 F.3d at 1350.

By the end of the Revolutionary War, the Six Nations lost most of what has been referred to as their "aboriginal lands" to the European settlers. *See id.* The Senecas—who had been allied with

-10-

Great Britain during the war—were largely driven from their villages and settled along the banks of Buffalo Creek in what is now Buffalo, New York. *See Seneca Nation of Indians*, 206 F. Supp. 2d at 469, 471.

In 1790, Congress passed the first Indian Trade and Intercourse Act ("the Non-Intercourse Act"), ch. 33, 1 Stat. 137 (1790); *see Mohegan Tribe v. Connecticut*, 638 F.2d 612, 616 (2d Cir. 1980). The Act provided that:

> no sale of lands made by any Indians, or any nation or tribe of Indians . . . within the United States, shall be valid to any person or persons, or to any state, . . . unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

Non-Intercourse Act § 4, 1 Stat. at 138. The Act's "obvious purpose" was "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress, and to enable the

Government, acting as parens patriae[3] for the Indians, to vacate any disposition of their lands made without its consent." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). The Non-Intercourse Act (in amended form) remains in effect today and now prohibits the "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians" without federal authorization. 25 U.S.C. § 177.

In 1794, the United States and the Iroquois Confederacy entered into the Treaty of Canandaigua (Treaty with the Six Nations), Nov. 11, 1794, 7 Stat. 44. *See Banner*, 238 F.3d at 1350. The treaty described the Seneca Nation's lands as encompassing much of the western part of New York. *See id.* at 1350; *see also* 7 Stat. at 45. "[O]ccupancy of the[se] land[s] . . . was granted the Senecas free of

---

[3] When the Government acts as parens patriae, it acts "in its capacity as provider of protection to those unable to care for themselves." *Parens Patriae*, Black's Law Dictionary 1287 (10th ed. 2014). "[T]he traditional concept of parens patriae . . . [was drawn from] the King's power as guardian of persons under legal disability to act for themselves . . . ." *Commonwealth of Puerto Rico ex rel. Quiros v. Bramkamp*, 654 F.2d 212, 217 (2d Cir. 1981).

the operation of state laws." *United States v. City of Salamanca*, 27 F. Supp. 541, 544 (W.D.N.Y. 1939). In the treaty, the United States acknowledged that these lands were "the property of the Seneka [N]ation . . . until they choose to sell [them]" and promised that the United States would "never claim the same [lands]." 7 Stat. at 45.

The Seneca Nation's land base decreased significantly, however, through a series of subsequent treaties. Most notably, in the Treaty of Big Tree in 1797, the federal government authorized Robert Morris to purchase the vast majority of the Seneca Nation's landholdings. *See* Treaty of Big Tree (Treaty with the Seneca, 1797), Sept. 15, 1797, 7 Stat. 601; *see also City of Salamanca*, 27 F. Supp. at 544. This purchase left the Seneca Nation with approximately 200,000 acres of reservation lands, including the Allegany Reservation in Cattaraugus County, New York. *See* 7 Stat. at 602; *City of Salamanca*, 27 F. Supp. at 544.

## 2. The Allegany Reservation Leases

The present Seneca Nation's "Allegany Reservation lies along that part of the Allegheny River that hooks into New York. It extends approximately 42 miles along a narrow strip averaging a mile wide on both sides of the river from Vandalia, New York, to the Pennsylvania border." H.R. Rep. No. 101-832, at 3 (1990). While it was originally considered to be of little value, the land's worth increased significantly as railroads were built through it to the west. *City of Salamanca*, 27 F. Supp. at 544. Throughout the mid-1800s, non-Indians settled in an area of the Allegany Reservation located at the junction of three major intercontinental railroads. *Banner*, 238 F.3d at 1351. The junction and the settlement that arose around it became what is now the City of Salamanca in Cattaraugus County. *Id.*

Early settlers on the Allegany Reservation entered into property leases with the Seneca Nation. *Id.* Sometime before 1875, New York state courts declared the leases invalid under the Non-

Intercourse Act, because they had been taken without the authorization of the federal government. *See City of Salamanca*, 27 F. Supp. at 544; *see also Buffalo, R. & P.R. Co. v. Lavery*, 27 N.Y.S. 443, 444 (N.Y. Gen. Term 1894). The State of New York subsequently asked Congress to provide authorization for the leases by ratifying them. *City of Salamanca*, 27 F. Supp. at 544.

In 1875, Congress ratified the leases, providing that they would be valid for five years and renewable for a period not exceeding twelve years. *See* Act of Feb. 19, 1875, ch. 90, 18 Stat., pt. 3, at 330; *City of Salamanca*, 27 F. Supp. at 544. In 1890, Congress extended the lease renewal period to ninety-nine years. *See* Act of Sept. 30, 1890, ch. 1132, 26 Stat. 558; *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 544 (2d Cir. 1991).

The leases became a source of tension between the Seneca Nation, its lessees, and the state and federal governments. *See* 25 U.S.C. § 1774(a). "The average rent on these leases was a nominal

amount, between $1 and $10 annually, and did not increase over the entire 99 year term of the leases." *Banner*, 238 F.3d at 1351. Accordingly, the Seneca Nation claimed that it had been forced to accept below-market rents for the leases, and that the federal government had participated in denying the Nation fair value for the land by ratifying the leases. *See id.* at 1351–52.

### 3.     The Seneca Nation Settlement Act

In anticipation of the expiration of the renewed leases in 1991, the State of New York began negotiating new leases with the Seneca Nation in 1969. *See Fluent*, 928 F.2d at 544. The Seneca Nation agreed to provide new 40-year leases to its lessees, with a right to renew the leases for an additional 40 years. *Id.* One of the conditions of this agreement between the Seneca Nation and New York was that New York and the federal government would pay the Seneca Nation the estimated difference between the rents that the Seneca Nation had

actually received and the fair market rental value of the leases over the 99-year period. *See id.*

Congress responded by enacting the SNSA, which appropriated thirty-five million dollars to the Seneca Nation.[4] *See* 25 U.S.C. §§ 1774, 1774d(b). Release of these funds was contingent upon the Seneca Nation agreeing to offer new leases and relinquishing its claims for rental payments accrued prior to February 20, 1991. *See id.* § 1774b. Of these funds, Congress designated thirty million dollars "to be managed, invested, and used by the [Seneca] Nation to further specific objectives of the [Seneca] Nation and its members, all as determined by the [Seneca] Nation in accordance with the Constitution and laws of the [Seneca] Nation." *Id.* § 1774d(b)(1). The other five million dollars was "to be used for the economic and community development of the Seneca Nation." *Id.* § 1774d(b)(2)(A).

---

[4] New York paid an additional twenty-five million dollars. *See Fluent*, 928 F.2d at 544.

Also especially important to this case is a provision of the SNSA that permitted the Seneca Nation to acquire additional land with the funds it provided:

> Land within [the Seneca Nation's] aboriginal area in . . . [New York] State or situated within or near proximity to former reservation land may be acquired by the Seneca Nation with funds appropriated pursuant to this subchapter. State and local governments shall have a period of 30 days after notification by the Secretary [of the Interior] or the Seneca Nation of acquisition of, or intent to acquire such lands to comment on the impact of the removal of such lands from real property tax rolls of State political subdivisions. Unless the Secretary determines within 30 days after the comment period that such lands should not be subject to the provisions of section 2116 of the Revised Statutes (25 U.S.C. 177) [(the Non-Intercourse Act)], such lands shall be subject to the provisions of that Act and *shall be held in restricted fee status* by the Seneca Nation.

*Id.* § 1774f(c) (emphasis added).

The SNSA is unique in creating a mechanism for newly acquired tribal lands to be held in restricted fee. Most restricted fee lands attained this status under the allotment system of the late nineteenth and early twentieth centuries, when the federal

-18-

government transferred parcels of tribal lands to individual Indians via either "trust patents" or "restricted fee patents." *See United States v. Bowling*, 256 U.S. 484, 486–87 (1921); *see also Cohen's Handbook of Federal Indian Law* § 16.03[1] (Nell Jessup Newton ed., 2012) ("*Cohen's Handbook*"); Louis R. Moore & Michael E. Webster, 2-26 Law of Federal Oil and Gas Leases § 26.01(3) (2014). Under trust patents, title was held by the United States in trust for the allottee, while under restricted fee patents, Indians received fee title subject to restrictions on alienation imposed by the United States. *See Bowling*, 256 U.S. at 486–87; Moore & Webster, *supra* § 26.01(3). As a practical matter, the distinction between the two kinds of patents had little effect, since both types of allotments were subject to restrictions imposed by the United States. *See, e.g.*, *Okla. Tax Comm'n v. United States*, 319 U.S. 598, 618 (1943) ("The power of Congress over 'trust' and 'restricted' lands is the same, and in practice the terms have been used interchangeably." (citation omitted)); *Bowling*, 256 U.S. at

487 ("As respects both classes of allotments—one as much as the other—the United States possesses a supervisory control over the land . . . .").

Although the allotment system was for the most part abandoned by 1934, *see Cohen's Handbook* § 16.03[2][c], limitations on trust lands and restricted fee lands continue to affect Indian landholding. *See, e.g.*, 25 C.F.R. § 151.2(d), (e); 43 C.F.R. § 4.201. DOI regulations, first enacted in 1980, define "[t]rust land or land in trust status" as "land the title to which is held in trust by the United States for an individual Indian or a tribe." 25 C.F.R. § 151.2(d). In contrast, "[r]estricted land or land in restricted status" is defined as follows:

> land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary because of limitations contained in the conveyance instrument pursuant to Federal law or because of a Federal law directly imposing such limitations.

*Id.* § 151.2(e).

Most newly acquired tribal lands today are held in trust by the federal government pursuant to the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. §§ 461–494a.[5] *See* 25 U.S.C. § 465; *Cohen's Handbook* § 15.03; *see also City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 220–21 (2005) (discussing this mechanism of the IRA). The IRA authorizes the Secretary of the Interior to convert fee lands owned by a tribe to trust status by accepting legal title to these lands in the name of the United States in trust for the tribe. *See Cohen's Handbook* § 15.07[1][b]; *see also* 25 U.S.C. § 465.

In contrast to the IRA, § 1774f(c) of the SNSA authorizes the Secretary of the Interior to permit the Seneca Nation to hold lands that the tribe acquires with SNSA funds in restricted fee status. *See*

---

[5] Under the IRA, "[t]he Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands . . . , within or without existing reservations, . . . for the purpose of providing land for Indians." 25 U.S.C. § 465. Title to any lands acquired pursuant to the IRA "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." *Id.*

25 U.S.C. § 1774f(c). As mentioned previously, the SNSA appears to be unique in this regard.

## II. Factual Background to This Action

On August 18, 2002, the Seneca Nation and the State of New York executed a Nation-State Gaming Compact ("the Compact"), stating that the Seneca Nation would be permitted to establish class III gaming facilities in the City of Buffalo on lands purchased with SNSA funds. New York agreed to support the Seneca Nation "in its use of the procedure set forth in . . . 25 U.S.C. § 1774f(c), to acquire restricted fee status for [those] site[s]." J.A. 124.

Because then-Secretary of the Interior Gale A. Norton declined to approve or disapprove the Compact within 45 days after it was submitted for approval, it was considered approved under IGRA as of October 25, 2002.[6] In her written statement, Secretary Norton

---

[6] IGRA provides that "[i]f the Secretary [of the Interior] does not approve or disapprove a compact . . . before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be

concluded that the prohibition of gaming on after-acquired land in Section 20 of IGRA applied to restricted fee lands, but that class III gaming activities would nevertheless be permissible on the lands described in the Compact because they were "Indian lands" subject to the tribe's jurisdiction and Section 20's "settlement of a land claim" exception applied. *See* 25 U.S.C. §§ 2710(d)(1), 2719(b)(1)(B)(i).

On November 25, 2002, the Seneca Nation submitted a proposed class III gaming ordinance to the NIGC Chairman for approval. The proposed ordinance stated that it would permit and regulate gaming on the Seneca Nation's "Nation lands," which were equivalent to "Indian lands" as defined in IGRA, but it did not specify a particular geographic location. J.A. 241. On November 26, 2002, then-NIGC Chairman Philip N. Hogen approved the ordinance.

---

considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]." 25 U.S.C. § 2710(d)(8)(C).

On October 3, 2005, the Seneca Nation purchased approximately nine acres of land in Buffalo, New York—the Buffalo Parcel. That same day, the Seneca Nation President notified the Governor of New York, the County Executive of Erie County, and the Mayor of the City of Buffalo of the purchase, stating that the lands were "acquired . . . for the purposes set forth in the 'Nation-State Gaming Compact.'" J.A. 212, 216, 220.

After 30 days passed without comment, the Seneca Nation notified the Secretary of the Interior of its "compliance" with the SNSA and stated that "the Buffalo Parcel[] w[as] acquired by the Seneca Nation in order to operate Class III gaming and related facilities pursuant to the Nation-State Gaming Compact." J.A. 142. The Secretary of the Interior did not determine within 30 days after the comment period that the Buffalo Parcel should not be subject to the Non-Intercourse Act, 25 U.S.C. § 177. Accordingly, at that time,

-24-

the Buffalo Parcel became "restricted fee" land by operation of the SNSA. *See* 25 U.S.C. § 1774f(c).

## III.   Proceedings in the District Court

### A.   The First Lawsuit (*CACGEC I*)

In January 2006, the plaintiffs—certain anti-gaming groups, legislators, and individual residents and owners of land in Buffalo— sued the NIGC and the DOI, challenging the approval of the ordinance. *See* Compl., *Citizens Against Casino Gambling in Erie Cty. v. Kempthorne*, No. 06-CV-001 (WMS) (W.D.N.Y. filed Jan. 3, 2006). The defendants moved to dismiss the complaint, and the plaintiffs moved for summary judgment. *See CACGEC I*, 471 F. Supp. 2d at 302.

On January 12, 2007, the district court denied the defendants' motion to dismiss the plaintiffs' claims against the NIGC, concluding that the NIGC Chairman had not determined whether the lands were subject to IGRA before approving the ordinance. *See CACGEC I*, 471 F. Supp. 2d at 303. In particular, there was no

indication in the record that the NIGC Chairman had considered the location where the Seneca Nation intended to purchase land or the manner in which it intended to acquire and hold that land. *See id.* The court found that "whether Indian gaming will occur on Indian lands is a threshold jurisdictional question that the NIGC must address on ordinance review." *Id.* The court therefore vacated the ordinance approval and remanded the ordinance to the NIGC. *Id.* at 323–27.

**B.     The Second Lawsuit (*CACGEC II*)**

After *CACGEC I*, the Seneca Nation submitted an amended class III gaming ordinance identifying the Buffalo Parcel to the NIGC. On July 2, 2007, Chairman Hogen approved the ordinance, finding that the Buffalo Parcel was eligible for gaming for the same reasons articulated by Secretary Norton.

On July 12, 2007, the plaintiffs filed a new lawsuit challenging the approval of the amended ordinance. *See* Compl., *Citizens Against Casino Gambling in Erie Cty. v. Hogen*, No. 07-CV-451 (WMS)

(W.D.N.Y. filed Jul. 12, 2007). The defendants moved to dismiss the complaint, and the plaintiffs moved for summary judgment. *See CACGEC II*, 2008 WL 2746566 at *2. The Seneca Nation appeared as *amicus curiae* in support of the defendants. *See id.* at *28.

The district court agreed with the defendants that the Seneca Nation has jurisdiction over the Buffalo Parcel and that the Buffalo Parcel constitutes "Indian lands" under IGRA, *id.* at *51, but found the NIGC's conclusion that the Buffalo Parcel was exempt from Section 20's prohibition to be arbitrary and capricious. *Id.* at *61–62. The court rejected the Seneca Nation's argument as *amicus curiae* that the prohibition does not apply to restricted fee lands,[7] *see id.* at *53, and concluded that the "settlement of a land claim" exception did not apply. *Id.* at *58–61. The court therefore granted the plaintiffs' motion for summary judgment and vacated the amended ordinance. *Id.* at *62-63. The plaintiffs appealed the court's holding that the

---

[7] In *CACGEC II*, neither the plaintiffs nor the defendants challenged Chairman Hogen's conclusion that Section 20's prohibition applies to lands held in restricted fee. *See CACGEC II*, 2008 WL 2746566, at *53.

Buffalo Parcel was "Indian lands" subject to tribal jurisdiction, and the defendants cross-appealed the grant of the plaintiffs' motion for summary judgment.

**C.     The Third Lawsuit (*CACGEC III*)**

While decision on the parties' cross-motions was pending in *CACGEC II*, the DOI promulgated final regulations regarding IGRA Section 20. *See* 25 C.F.R. §§ 292.1–292.26; Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354-01 (May 20, 2008). The regulations prohibit gaming on "land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988." 25 C.F.R. § 292.2. The DOI explained that it specifically declined to include restricted fee lands in this definition because Section 20 "refers only to lands acquired in trust" and "[t]he omission of restricted fee from [Section 20] is considered purposeful, because Congress referred to restricted fee lands elsewhere in IGRA, including at [25 U.S.C. §§] 2719(a)(2)(A)(ii) and 2703(4)(B)." 73 Fed. Reg. at 29,355. The regulations became

effective on August 25, 2008. Gaming on Trust Lands Acquired After October 17, 1988; Correction, 73 Fed. Reg. 35,579-02 (June 24, 2008).

On October 22, 2008, the Seneca Nation submitted another amended gaming ordinance to the NIGC for approval. On November 14, 2008, the NIGC requested that the DOI explain its new interpretation of Section 20 to assist the Chairman in deciding whether to approve the amended ordinance.

On January 18, 2009, the DOI responded with a Solicitor's M-Opinion.[8] The Solicitor concluded that by its plain text Section 20 unambiguously applies only to trust lands, and that even if the phrase "in trust" was ambiguous, the DOI's interpretation was reasonable. The Solicitor concluded that, in reaching the opposite conclusion, Secretary Norton had mistakenly assumed that all off-

---

[8] The Solicitor of the DOI has authority over the DOI's "legal work." 43 U.S.C. § 1455. An M-Opinion is a formal legal opinion signed by the Solicitor. *See* Sam Kalen, *Changing Administrations and Environmental Guidance Documents*, 23 Nat. Res. & Env't 13, 14 (2008). "[T]he Solicitor's M-Opinions are binding on the DOI as a whole. After an M-Opinion is completed, the DOI will take action consistent with the legal interpretation explained by the Solicitor." *Sims v. Ellis*, 972 F. Supp. 2d 1196, 1202 n.5 (D. Idaho 2013).

reservation lands acquired by tribes after IGRA would automatically be subject to the restriction on alienation imposed by the Non-Intercourse Act. According to the Solicitor, off-reservation lands acquired in fee are not automatically subject to the Non-Intercourse Act in the absence of further action by the federal government.[9]

On January 20, 2009, the NIGC Chairman approved the Seneca Nation's second amended gaming ordinance. The Chairman stated that the NIGC had reexamined its position regarding the applicability of Section 20 to restricted fee lands in light of the DOI's regulations. In a 22-page letter, the Chairman detailed his analysis of whether the Buffalo Parcel was eligible for class III gaming. The Chairman concluded that the Seneca Nation has jurisdiction over the Buffalo Parcel and that the Buffalo Parcel qualifies as "Indian lands";

---

[9] The plaintiffs claim that the DOI regulations regarding Section 20 and the Solicitor's M-Opinion were infected by a conflict of interest due to the involvement of a particular attorney at the DOI's Solicitor's Office. That attorney was married to a partner at a law firm that has performed lobbying work for the Seneca Nation in the past. We have considered this argument and found it to be without merit because, *inter alia*, the record does not demonstrate an actual conflict of interest that affected the regulations or the M-Opinion.

adopted the DOI's position that as restricted fee land it is not subject to Section 20's prohibition; and approved the ordinance.

On March 31, 2009, the plaintiffs filed a third lawsuit, challenging the NIGC's approval of the most recent ordinance. Compl., *Citizens Against Casino Gambling in Erie Cty. v. Stevens*, No. 09-CV-291 (WMS) (W.D.N.Y. filed Mar. 31, 2009). The plaintiffs challenged the defendants' (1) determination that the Buffalo Parcel qualifies as "Indian lands" and that the Seneca Nation has jurisdiction over it, (2) interpretation of Section 20, and (3) interpretation of the "settlement of a land claim" exception. The plaintiffs also alleged that the DOI had acted arbitrarily and capriciously in promulgating its Section 20 regulations.

The defendants filed the Administrative Record of the NIGC and the DOI concerning the NIGC's January 2009 approval of the Seneca Nation's gaming ordinance with the court.

On September 20, 2012, the plaintiffs moved for summary judgment on all claims. *See CACGEC III*, 945 F. Supp. 2d at 393.

In a May 10, 2013 opinion, the district court denied the plaintiffs' motion and dismissed the case, finding that the Buffalo Parcel is eligible for class III gaming under IGRA. *Id.* at 411, 413. The district court first reaffirmed its earlier holding in *CACGEC II* that the Buffalo Parcel is subject to tribal jurisdiction and constitutes "Indian lands." *Id.* at 400–05. As to Section 20, however, the court found that a "new and critical dispute ha[d] surfaced" because the parties no longer agreed that Section 20's prohibition applied to lands held in restricted fee.[10] *Id.* at 393. Pointing to IGRA's plain text, the district court held that Congress intended Section 20's prohibition to apply only to lands held in trust. *See id.* at 407. The court also found the agencies' interpretation of Section 20 to be reasonable, observing that the "NIGC fully considered Secretary

[10] The district court concluded that its discussion of this issue in *CACGEC II* was dictum because the argument had been raised only by the *amicus curiae*. *CACGEC III*, 945 F. Supp. 2d at 406.

-32-

Norton's earlier reasoning" and that "both [the] DOI and NIGC considered the body of Indian law existing at the time of IGRA's passage and thereafter." *Id.* at 408. Finally, because the Buffalo Parcel was not subject to Section 20's prohibition, the court declined to address the applicability of the "settlement of a land claim" exception and dismissed the plaintiffs' claims. *Id.* at 412–13.

The plaintiffs appealed. On September 11, 2013, the appeal of *CACGEC I*, cross-appeals of *CACGEC II*, and appeal of *CACGEC III* were consolidated.

## DISCUSSION

The plaintiffs contend that the district court erred in *CACGEC III* in upholding the DOI and the NIGC's determination that the Buffalo Parcel is eligible for class III gaming and in upholding their approval of the amended gaming ordinance. The plaintiffs argue that the agencies acted arbitrarily and capriciously, and in violation of law, in concluding (1) that the Buffalo Parcel is subject to the

Seneca Nation's tribal jurisdiction, which is a prerequisite for land to be eligible for gaming under IGRA, (2) that the Buffalo Parcel qualifies as "Indian lands" as defined in IGRA, 25 U.S.C. § 2703(4), and (3) that the Parcel is not subject to Section 20's prohibition on gaming on lands acquired after IGRA's enactment.[11]

**I.      Standard of Review**

"Under the Administrative Procedure Act [("APA"), 5 U.S.C. §§ 701–706], a [district] court may 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

---

[11] The parties and the district court apparently regarded the question of whether the Buffalo Parcel was subject to tribal jurisdiction to be part of the analysis of whether it qualifies as "Indian lands," as defined in IGRA, 25 U.S.C. § 2703(4). *See, e.g., CACGEC III*, 945 F. Supp. 2d at 400–05. Because we find that other provisions of IGRA—beyond the definition of "Indian lands"—expressly require a finding of tribal jurisdiction as a prerequisite to gaming, *see* 25 U.S.C. § 2710(b)(2), (d)(1)(A), we discuss the tribal jurisdiction question and the "Indian lands" question separately below. It is clear, though, from the plaintiffs' arguments before the district court and on appeal that the plaintiffs' challenge to the agencies' "Indian lands" determination includes a challenge to the agencies' determination that the Seneca Nation has jurisdiction over the Buffalo Parcel. *See* Appellants' Br. at 31–52.

with law.'" *Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 96–97 (2d Cir. 2001) (ellipsis in original) (quoting 5 U.S.C. § 706(2)(A)).

> [A]gency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Nat. Res. Def. Council v. U.S. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"Review under [5 U.S.C. § 706(2)(A)] is 'narrow,' limited to examining the administrative record to determine 'whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Muszynski*, 268 F.3d at 97 (second alteration in original) (quoting *City of New York v. Shalala*, 34 F.3d 1161, 1167 (2d Cir. 1994)). "This court

reviews a district court's review of an agency action de novo." *Id.* at 96.

Agency actions are generally reviewable under the APA as long as (1) there has been a "final agency action," (2) the final agency action is not committed to agency discretion by law, and (3) Congress, subject to constitutional constraints, did not implicitly or explicitly preclude judicial review. *See Sharkey v. Quarantillo*, 541 F.3d 75, 87 (2d Cir. 2008). IGRA expressly provides that "[d]ecisions made by the Commission pursuant to section[] 2710, [which includes approval of gaming ordinances,] . . . shall be final agency decisions for purposes of appeal to the appropriate Federal district court pursuant to [the APA]." 25 U.S.C. § 2714. Where a "final agency action" is presented for review, "intermediate actions leading up to that final action are reviewable as well." *Benzman v. Whitman*, 523 F.3d 119, 132 (2d Cir. 2008) (citing 5 U.S.C. § 704).

**II.    Whether the Seneca Nation Has Jurisdiction Over the Buffalo Parcel**

IGRA requires that any tribe seeking to conduct gaming on land must have jurisdiction over that land. *See* 25 U.S.C. § 2710(d)(1)(A) ("Class III gaming activities shall be lawful on Indian lands only if such activities are . . . authorized by an ordinance or resolution that . . . is adopted by the governing body of the Indian tribe having jurisdiction over such lands, [and] . . . meets the requirements of subsection (b) of this section . . . ."); *id.* § 2710(b)(2) ("The Chairman [of the NIGC] shall approve any tribal ordinance or resolution concerning the conduct, or regulation of class II gaming on the Indian lands within the tribe's jurisdiction if [certain conditions are met]."). Thus, we first address the plaintiffs' argument that the agencies erred in concluding that the Seneca Nation has jurisdiction over the Buffalo Parcel.

We begin our analysis by noting that what we refer to as "tribal jurisdiction" is a combination of tribal and federal jurisdiction

over land, to the exclusion of the jurisdiction of the state. Lands subject to federal and tribal jurisdiction have historically been referred to as "Indian country."[12] *See, e.g.*, *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998); *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1006 (8th Cir. 2010); *Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 973 (10th Cir. 1987) (collecting cases). "[P]rimary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." *Venetie*, 522 U.S. at 527 n.1. Thus, "[a] state ordinarily may not regulate the property or conduct of tribes . . . in Indian country." *Cohen's Handbook* § 6.03[1][a]. "The limitation on state power in Indian country stems

---

[12] The term "Indian country" is not to be confused with the term "Indian lands," which is statutorily defined in IGRA, 25 U.S.C. § 2703(4). *See id.* ("The term 'Indian lands' means—(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."). Whether the Buffalo Parcel satisfies the definition of "Indian lands" under IGRA is discussed below in Section III.

from the Indian commerce clause, which vests exclusive legislative authority over Indian affairs in the federal government." *Id.*; *see* U.S. Const. art. I, § 8, cl. 3. "This constitutional vesting of federal authority vis-à-vis the states allows tribal sovereignty to prevail in Indian country, unless Congress legislates to the contrary." *Cohen's Handbook* § 6.03[1][a]. "Because of plenary federal authority in Indian affairs, there is no room for state regulation." *Id.* Thus, the question here is whether, through the SNSA, Congress removed the Buffalo Parcel from New York State's jurisdiction.

New York will "not have jurisdiction if [the Buffalo Parcel] . . . [is] 'Indian country.'" *DeCoteau v. Dist. Cty. Court for Tenth Judicial Dist.*, 420 U.S. 425, 427 (1975); *see id.* at 427 & n.2; *see also Venetie*, 522 U.S. at 527 & n.1. "Indian country" is now statutorily defined as

> (a) all land within the limits of any Indian reservation
> under the jurisdiction of the United States Government,
> notwithstanding the issuance of any patent, and,
> including rights-of-way running through the

reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. Although by its terms § 1151 relates only to federal criminal jurisdiction, it has been "recognized [as] . . . appl[ying] to questions of [a tribe's] civil jurisdiction" as well. *Venetie*, 522 U.S. at 527.

The Buffalo Parcel is neither reservation land nor an allotment. Therefore, we consider whether it qualifies as a "dependent Indian communit[y]." *See* 18 U.S.C. § 1151.

Significantly, the term "dependent Indian communities" developed historically, as "[t]he entire text of § 1151(b), . . . [including] the term 'dependent Indian communities,' is taken virtually verbatim from [*United States v.*] *Sandoval*[, 231 U.S. 28, 46 (1913)], which language [the Supreme Court] later quoted in [*United States v.*] *McGowan*[, 302 U.S. 535, 538 (1938)]." *Venetie*, 522 U.S. at

530. "[T]he Historical and Revision Notes to the statute that enacted § 1151 state that § 1151's definition of Indian country is based on the latest construction of the term by the United States Supreme Court in *U.S. v. McGowan* . . . following *U.S. v. Sandoval*." *Id.* (internal quotation marks omitted).

Despite the long historical use of the term, it was explicitly defined by the Supreme Court only within the last two decades. In *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. at 527, the Supreme Court defined "dependent Indian communities" as referring to "a limited category of . . . lands . . . that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." *Id.* "The federal set-aside requirement ensures that the land in question is occupied by an 'Indian community'" and "reflects the fact that because Congress has plenary power over Indian affairs, some explicit action by

Congress (or the Executive, acting under delegated authority) must be taken to create or to recognize Indian country."[13] *Id.* at 531 & n.6 (citation omitted). "[T]he federal superintendence requirement guarantees that the Indian community is sufficiently 'dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." *Id.* at 531. Federal superintendence has been found where "the Federal Government actively control[s] the lands in question, effectively acting as a guardian for the Indians." *Id.* at 533. The Supreme Court observed that its cases prior to the enactment of § 1151 had "relied upon a finding of both a federal set-aside and federal superintendence [to] conclud[e] that the Indian lands in question constituted Indian

---

[13] We do not view the Supreme Court's reference to "land . . . *occupied* by an 'Indian community' " as requiring actual Indian residency, as the plaintiffs suggest. *Venetie*, 522 U.S. at 531 (emphasis added). Rather, as discussed more fully below, we view the federal set-aside requirement as described in *Venetie* as requiring only that the federal government has set aside the land for tribal use in order to further tribal interests.

country and that it was permissible for the Federal Government to exercise jurisdiction over them." *Id.* at 530. The Court's definition of "dependent Indian communities" in *Venetie* was "based on [its] conclusion that in enacting § 1151, Congress codified these two requirements, which previously . . . [were] held necessary for a finding of 'Indian country' generally." *Id.* at 527.

*Venetie* involved an effort by the Native Village of Venetie's tribal government to impose taxes upon non-members of the tribe who were conducting business on tribally owned land. *See id.* at 525. The land had been acquired pursuant to the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1601–1629h. *See Venetie*, 522 U.S. at 524. Under the ANCSA, Congress revoked reservation status for land that had been set aside for the tribe, provided $962.5 million in state and federal funds to newly created, state-chartered, private corporations owned by tribal members, and authorized the transfer of former reservation lands in fee simple to the private corporations.

*Id.* The tribe acquired title to former reservation land after it was transferred to the private corporations. *Id.* Alaska challenged the tribe's authority to impose a tax on non-members conducting business on that land. *Id.* at 525. The district court held that the tribe lacked such authority, finding that ANCSA lands were not "dependent Indian communities" under 18 U.S.C. § 1151. *Venetie*, 522 U.S. at 525.

The Supreme Court agreed, concluding that neither the federal set-aside nor the federal superintendence requirement was met. Federal set-aside was absent because ANCSA "transferred reservation lands to private, state-chartered Native corporations, without any restraints on alienation or significant use restrictions, and with the goal of avoiding 'any permanent racially defined institutions, rights, privileges, or obligations.'" *Id.* at 532–33 (quoting 43 U.S.C. § 1601(b)). Thus, "[b]y ANCSA's very design, Native corporations c[ould] immediately convey former reservation lands

-44-

to non-Natives, and such corporations [were] not restricted to using those lands for Indian purposes." *Id.* at 533.

As to the superintendence requirement, the Court concluded that ANCSA had "*ended* federal superintendence over the Tribe's lands." *Id.* (emphasis added). The Court observed that "ANCSA revoked the Venetie Reservation . . . and Congress stated explicitly that ANCSA's settlement provisions were intended to avoid a 'lengthy wardship or trusteeship.'" *Id.* (quoting 43 U.S.C § 1601(b)). It also noted that "Congress conveyed ANCSA lands to state-chartered and state-regulated private business corporations," which was "hardly a choice that comports with a desire to retain *federal* superintendence over the land." *Id.* at 534. The Court distinguished the federal government's remaining protection of the land—which was "essentially limited to a statutory declaration that the land [was] exempt from adverse possession claims, real property taxes, and certain judgments as long as it has not been sold, leased, or

developed"—from the federal involvement that existed in the Supreme Court's prior cases where superintendence was found; in those cases, "the Federal Government actively controlled the lands in question, effectively acting as a guardian for the Indians." *Id.* at 533.

We agree with the Tenth Circuit that "[s]imply put, *Venetie* held that Congress—not the courts, not the states, not the Indian tribes—gets to say what land is Indian country subject to federal jurisdiction." *Hydro Res., Inc. v. E.P.A.*, 608 F.3d 1131, 1151 (10th Cir. 2010) (en banc). In determining whether Congress has designated land as a "dependent Indian community," we consider whether the land bears the dual marks of federal set-aside and federal superintendence. The set-aside requirement ensures that the federal government designated the land to serve the interests of an "Indian community"—the tribe qua tribe—while the superintendence

requirement ensures that the tribe is "dependent" on the federal government in the sense of being subject to federal control.

We conclude that the Buffalo Parcel satisfies both requirements.

First, through the SNSA, Congress demonstrated its intent that lands acquired with SNSA funds that attained restricted fee status pursuant to the SNSA be set aside for the use of the Seneca Nation. Congress limited the lands that the Seneca Nation could purchase using SNSA funds to "[l]and[s] within [the Seneca Nation's] aboriginal area in the State or situated within or near proximity to former reservation land," 25 U.S.C. § 1774f(c), reflecting its intent to enable the Seneca Nation to restore some of its lost land base in proximity to land historically occupied by the tribe. Congress also designated these lands for tribal use by directing that the SNSA funds used to purchase them be "managed, invested, and used by the [Seneca] Nation to further specific objectives of the Nation and

its members, all as determined by the Nation in accordance with the Constitution and laws of the Nation." *Id.* § 1774d(b)(1); *see id.* § 1774f(c). Finally, by creating a mechanism for these lands to attain restricted fee status, Congress ensured that the tribe would maintain ownership of its restricted fee lands, through the restriction that required approval of the federal government before the lands could be transferred. *See id.* § 177. The set-aside requirement is therefore satisfied. *See Venetie*, 522 U.S. at 528 (observing that the requirements of a dependent Indian community were satisfied in *Sandoval* where "Congress had recognized the [tribe's] title to their ancestral lands by statute, . . . Executive orders had reserved additional public lands for the [tribe's] use[,] . . . [and] Congress had enacted legislation with respect to the lands . . . [that] includ[ed] federal restrictions on the lands' alienation" (internal quotation marks omitted)). *Compare* 25 U.S.C. §§ 1774d(b)(1), 1774f(c), *with Venetie*, 522 U.S. at 533 ("Because Congress contemplated that non-Natives could own the former

Venetie Reservation, and because the Tribe is free to use it for non-Indian purposes, we must conclude that the federal set-aside requirement is not met.").

Second, Congress demonstrated its intent for the Buffalo Parcel to be subject to federal superintendence by providing for federal control in both the process by which the Parcel attained restricted fee status and in limiting the alienability of this land once it attained restricted fee status. The SNSA provides that lands acquired by the Seneca Nation may be made subject to the Non-Intercourse Act unless the Secretary decides otherwise. *See* 25 U.S.C. § 1774f(c). Thus, lands purchased using SNSA funds are not automatically subject to a restriction against alienation. Rather, only after a period of comment by state and local governments and a determination by the Secretary do the lands become subject to the Non-Intercourse Act. *See id.* Land therefore attains restricted fee status only if the Secretary declines to exercise his or her power to

prevent the land from doing so. In allowing lands to pass into restricted fee status, the Secretary decides to take responsibility for those lands "to prevent unfair, improvident or improper disposition by [the Seneca Nation] . . . [and] to vacate any disposition of their lands made without [the federal government's] consent." *Tuscarora Indian Nation*, 362 U.S. at 119. Once the lands become subject to the Non-Intercourse Act, there is no limit on how long the restriction against alienation will remain in effect; the lands continue to be held in restricted fee absent action by the federal government. *See* 25 U.S.C. §§ 177, 1774f(c). Accordingly, by creating this process in the SNSA, Congress demonstrated its intent to "actively control[] the lands in question, effectively acting as a guardian for the [Seneca Nation]"—hallmarks of federal superintendence. *Venetie*, 522 U.S. at 533. *Compare* 25 U.S.C. § 1774f(c), *with Venetie*, 522 U.S. at 533–34 (holding that in ANCSA Congress ended federal superintendence over the tribe's lands by revoking the lands' reservation status,

conveying the lands to private business corporations, and specifying that the ANCSA's provisions "were intended to avoid a 'lengthy wardship or trusteeship' " (quoting 43 U.S.C. § 1601(b))).

Thus, we conclude that Congress—through the SNSA—set aside the Buffalo Parcel for the Seneca Nation's use in order to further tribal interests and provided that the Parcel would be subject to federal superintendence. Because these dual requirements are met, the Seneca Nation has jurisdiction over this land, and New York has therefore been divested of its jurisdiction.

Congress's intent that the Buffalo Parcel be subject to the tribe's jurisdiction is also apparent from the similarities between § 1774f(c) of the SNSA and § 465 of the IRA. The plaintiffs do not dispute that lands that are taken into trust under the IRA are subject to tribal jurisdiction. *See City of Sherrill*, 544 U.S. at 220–21.[14] Such

---

[14] The plaintiffs argue that *City of Sherrill* holds that the IRA is the sole means for a tribe to establish jurisdiction over off-reservation fee lands. In *City of Sherrill*, the Supreme Court held that the Oneida Indians could not *unilaterally* revive tribal sovereignty over lands that had been subject to state jurisdiction for over

lands bear the marks of both federal set-aside and federal superintendence. *See Buzzard v. Okla. Tax Comm'n*, 992 F.2d 1073, 1076 (10th Cir. 1993); s*ee also Narragansett Indian Tribe of R.I. v. Narragansett Elec. Co.*, 89 F.3d 908, 920–21 (1st Cir. 1996). For land to attain trust status under the IRA, the Secretary of the Interior must consider, among other things, "the Indian's need for the land, and the purposes for which the land will be used" and then decide to take the land in trust. *Buzzard*, 992 F.2d at 1076 (citation omitted); *see also* 25 C.F.R. §§ 151.2, 151.9, 151.10, 151.11. In doing so, the federal government takes action indicating that the land is designated for Indian use. *See Buzzard*, 992 F.2d at 1076. The federal set-aside requirement is therefore fulfilled. *See id.*

---

two hundred years. 544 U.S. at 202–03. The Court noted that the tribe had a congressionally authorized avenue available to it to restore jurisdiction—the IRA. *See id.* at 220–21. But the Supreme Court did not state that this was the *only* avenue. In the SNSA, Congress provided a mechanism comparable to the IRA through which the Seneca Nation could attain jurisdiction over lands purchased with SNSA funds. Accordingly, the Seneca Nation did not unilaterally assert jurisdiction over the Buffalo Parcel; the land became subject to tribal jurisdiction pursuant to an express act of Congress and approval of the Secretary when she allowed it to pass into restricted fee.

The federal superintendence requirement is satisfied as well because the federal government is actively involved in the land when it decides to take it in trust. *See id.* The Secretary considers several factors, including the impact of removing the land from the state tax rolls and the jurisdictional problems that might arise, prior to taking the land in trust. *See id.* (citing 25 C.F.R. § 151.10). Once the Secretary decides to take the land in trust, the Secretary holds title as trustee, demonstrating that the federal government "is prepared to exert jurisdiction over the land." *Id*.

The SNSA's restricted fee mechanism bears analogous marks of federal set-aside and federal superintendence, and the obvious similarities between the IRA and the SNSA demonstrate congressional intent for the SNSA to have similar jurisdictional effects. Like the IRA, the SNSA provides the Secretary with discretion to determine whether lands held by tribes in fee should be taken into restricted fee. *Compare* 25 U.S.C. § 1774f(c), *with id.* § 465.

As a critical step in this process, the SNSA requires the Seneca Nation or the Secretary of the Interior to first notify state and local governments of the acquisition of lands under the SNSA. *Id.* § 1774f(c). Likewise, after a tribe requests trust status under the IRA, the Secretary is directed to notify state and local governments having regulatory jurisdiction over the lands to be acquired. *See* 25 C.F.R. § 151.10. Under both statutes, states and local governments then have a thirty-day period after notification to comment. *Compare* 25 U.S.C. § 1774f(c), *with* 25 C.F.R. § 151.10. Following this comment period, the Secretary has an additional period to determine whether the land should pass into restricted fee (under the SNSA) or be held in trust (under the IRA). *Compare* 25 U.S.C. § 1774f(c), *with* 25 C.F.R. §§ 151.11, 151.12. The SNSA, like the IRA, therefore anticipates the jurisdictional tensions between the federal government, the tribe, and the state, and provides the Secretary with discretion, after considering the state's concerns, to determine the jurisdictional

ramifications of conferring this new status on the lands. *Cf. City of Sherrill*, 544 U.S. at 220 (describing the IRA as "a mechanism for the acquisition of lands for tribal communities that takes account of the interests of others with stakes in the area's governance and well-being"). If the Secretary permits the land to pass into restricted fee or to be held in trust, then the land is used for tribal purposes and may not be transferred or disposed of without further action by the Federal Government. *See* 25 U.S.C. §§ 465, 1774f(c); *Cohen's Handbook* § 15.03, 15.07[1].

We recognize that neither the text of the IRA nor that of the SNSA explicitly states that lands that pass from fee to trust or restricted fee status are subject to tribal jurisdiction. The IRA states that lands taken into trust "shall be exempt from State and local taxation." 25 U.S.C. § 465. In similar language, the SNSA provides that lands may attain restricted fee status after a period of comment on the impact of "removal of such lands from real property tax rolls

of State political subdivisions." *Id.* § 1774f(c). But, "[r]ather than reading the omission of a provision exempting the lands from state regulation as evidencing a congressional intent to allow state regulation," courts construing the IRA have instead read "the omission as indicating that Congress simply took it for granted that the states were without such power, and that an express provision was unnecessary; i.e., that the exemption was implicit in the grant of trust lands under existing legal principles." *Santa Rosa Band of Indians v. Kings Cty.*, 532 F.2d 655, 666 n.17 (9th Cir. 1975); *see also Chase v. McMasters*, 573 F.2d 1011, 1018 (8th Cir. 1978); *City of Sault Ste. Marie v. Andrus*, 532 F. Supp. 157, 166 (D.D.C. 1980). We conclude that Congress intended this language to be interpreted the same way when used in the context of a closely related Indian law concept—restricted fee—in the SNSA.[15] *See United States v. Johnson*,

---

[15] This reading is also consistent with a long history of courts and Congress treating lands held in trust and those held in restricted fee identically for jurisdictional purposes. In the context of jurisdiction over allotments, the Supreme Court has held that there is no difference between trust lands and

-56-

14 F.3d 766, 770 (2d Cir. 1994) (holding that "[t]he fact that Congress chose to adopt . . . substantially identical language [in a new statute] . . . bespeaks an intention to import the established . . . interpretation of [the existing language] into the new statute"); *Air Transp. Ass'n of Am. (ATA) v. Prof'l Air Traffic Controllers Org. (PATCO)*, 667 F.2d 316, 321 (2d Cir. 1981) (stating that courts "can presume that Congress is aware of settled judicial constructions of existing law").

restricted fee lands, observing that "[i]n practical effect, the control of Congress . . . is the same." *United States v. Ramsey*, 271 U.S. 467, 471 (1926). Congress has also treated trust lands and restricted fee lands as equally subject to a number of federal controls. *See*, *e.g.*, 25 U.S.C. §§ 323 (Secretary's authority to grant rights-of-way), 407d (Secretary's authority to charge purchasers of timber for special services), 483a (individual Indian's power to execute mortgage or trust deed subject to approval by the Secretary), 1321 (limitation on tribe's ability to consent to state jurisdiction for certain criminal offenses), 1322 (same as to civil jurisdiction). Federal control over restricted fee lands is reflected in the DOI's implementing regulations as well. *See*, *e.g.*, 25 C.F.R. § 1.4(a) ("[N]one of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property . . . shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States.").

For the foregoing reasons, we hold that Congress intended lands purchased with SNSA funds and held in restricted fee to be subject to the Seneca Nation's tribal jurisdiction. We therefore affirm the district court's holding that the Buffalo Parcel is subject to tribal jurisdiction, as required by IGRA.

**III.     Whether the Buffalo Parcel is "Indian Lands" under IGRA, 25 U.S.C. § 2703(4)(B)**

The plaintiffs next argue that the district court erred in upholding the DOI and the NIGC's conclusion that the Buffalo Parcel is "Indian lands" as defined in IGRA, 25 U.S.C. § 2703(4)(B), another prerequisite for lands to be eligible for gaming. *See id.* § 2710(d)(1). For non-reservation lands, IGRA defines "Indian lands" as "lands [1] title to which is either held in trust by the United States for the benefit of any Indian tribe . . . or held by any Indian tribe . . . subject to restriction by the United States against alienation and [2] over which an Indian tribe exercises governmental power." *Id.*

§ 2703(4)(B). Both parties acknowledge that the Seneca Nation holds the Buffalo Parcel in restricted fee.

The plaintiffs argue in a footnote of their reply brief that the Buffalo Parcel is not "Indian lands" under IGRA because the Seneca Nation has not exercised governmental power over it. The plaintiffs claim that the Seneca Nation has "at best . . . exercise[d] the trappings of commercial ownership" on this land. Appellants' Reply Br. at 7 n.6. This is insufficient to raise the argument on appeal. *Cf. Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) ("Merely mentioning the relevant issue . . . is not enough; issues not sufficiently argued are in general deemed waived and will not be considered on appeal." (internal quotation marks omitted)).

Moreover, in approving the most recent ordinance prior to *CACGEC III*, the NIGC Chairman concluded that the Seneca Nation had exercised governmental power over the Buffalo Parcel since 2005 by policing the land with its own Marshal's Office, fencing the

land, posting signs stating that the Buffalo Parcel is subject to the Seneca Nation's jurisdiction, and enacting ordinances and resolutions applying Seneca law to this land. The plaintiffs did not challenge this aspect of the NIGC's determination in their complaint in *CACGEC III*, and they have not cited any authority demonstrating that this determination was arbitrary and capricious, an abuse of discretion, or otherwise in violation of law. Thus, we conclude that the district court did not err in upholding the agencies' determination that the Buffalo Parcel is "Indian lands" within the meaning of IGRA.

**IV.     Whether IGRA Section 20's Prohibition Applies to the Buffalo Parcel**

Finally, the plaintiffs argue that, even if the Buffalo Parcel is "Indian lands" and subject to tribal jurisdiction, it is nonetheless ineligible for class III gaming because IGRA Section 20's prohibition applies. The plaintiffs claim that the district court erred in *CACGEC III* by accepting the DOI and the NIGC's conclusion that Section 20

does not apply to lands held in restricted fee, and thus not to the Buffalo Parcel. The plaintiffs argue that this interpretation was arbitrary and capricious and an abuse of discretion because it undermines congressional intent to limit gaming on lands acquired after IGRA's enactment.

Section 20 prohibits gaming on "lands acquired *by the Secretary in trust* for the benefit of an Indian tribe after [the date of IGRA's enactment]." 25 U.S.C. § 2719(a) (emphasis added). The plain text of Section 20 therefore refers only to trust lands acquired by the Secretary, not to lands held in restricted fee by a tribe.[16] "When the words of a statute are unambiguous, . . . 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)

---

[16] The statute uses this "trust" language again in enumerating the exceptions to Section 20's prohibition. *See* 25 U.S.C. § 2719(b)(1)(B) ("Subsection (a) of this section will not apply when . . . lands are *taken into trust* as part of—(i) a settlement of a land claim, (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition." (emphasis added)).

(quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *see also United States v. Turkette*, 452 U.S. 576, 580 (1981).

Other principles of statutory construction confirm this plain text reading. The concept of lands being held by the Secretary in trust has a long history and well-established meaning in Indian law. *See Cohen's Handbook* § 15.03. "It is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." *Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861–62 (2014) (internal quotation marks omitted). The terms "trust lands" and "restricted lands" were already defined and distinguished from one another in DOI regulations in effect at the time of IGRA's enactment. *See* 25 C.F.R. § 151.2(d), (e); *see also* Land Acquisitions, 45 Fed. Reg. 62,034, 62,036 (Sept. 18, 1980). We presume that Congress was familiar with the regulatory definition of these terms when

enacting IGRA because Congress is "aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990).

Congress's awareness of the distinction between trust lands and restricted fee lands is also explicit in the text of IGRA itself. Congress referred both to lands held by the Secretary "in trust" and to lands held "subject to restriction by the United States against alienation" at other points in IGRA, most notably in the definition of "Indian lands." 25 U.S.C. § 2703(4). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). We therefore read Section 20's reference to trust lands, and exclusion of any reference to restricted fee lands, as intentionally confining Section 20's application to trust lands.

This interpretation comports with another principle of statutory construction as well: "In construing provisions ... in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision." *Comm'r v. Clark*, 489 U.S. 726, 739 (1989). In IGRA, Congress embodied its policy of "provid[ing] ... for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Section 20 is an exception to that general policy. A narrow reading of Section 20 therefore accords with Congress's intent to promote tribal interests through gaming. *See Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Att'y for W. Dist. of Mich.*, 369 F.3d 960, 971 (6th Cir. 2004) ("[T]he only evidence of intent strongly suggests that the thrust of the IGRA is to promote Indian gaming, not to limit it. Although [Section 20] creates a presumptive bar against casino-style gaming on Indian lands acquired after the enactment of the IGRA,

that bar should be construed narrowly . . . in order to be consistent with the purpose of the IGRA, which is to encourage gaming." (citation omitted)). This reading is also consistent with the congressional policy underlying the SNSA of "promot[ing] economic self-sufficiency for the Seneca Nation and its members." 25 U.S.C. § 1774(b)(6).

Finally, the Supreme Court has directed that "'statutes passed for the benefit of dependent Indian tribes are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'" *Bryan v. Itasca Cty.*, 426 U.S. 373, 392 (1976) (quoting *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 89 (1918)). The explicit policy underlying IGRA was to benefit tribes by helping them to achieve self-sufficiency and to grow economically. *See* 25 U.S.C. § 2702(1). We therefore conclude that because the Buffalo Parcel was not "acquired by the Secretary" and is not held "in trust," Section 20's prohibition does not apply.

The plaintiffs claim that the absence of a reference to restricted-fee lands in the text of Section 20 simply reflects that there was no mechanism prior to the SNSA for after-acquired lands to attain restricted fee status, and Congress—had it foreseen such a development at the time—would have intended such lands to be subject to Section 20 as well. But we are not permitted to disregard the plain text of the statute or the reading that follows from well-established principles of statutory construction. Moreover, Congress was aware of IGRA at the time it enacted the SNSA. *Cf. Miles*, 498 U.S. at 32. When it decided to provide for restricted fee lands, Congress had the power also to prohibit gaming on those lands. Congress could have prohibited gaming in the SNSA itself, as it had done before in other Indian legislation. *See, e.g.*, 25 U.S.C. § 1708(b) (stating, in the Rhode Island Indian Claims Settlement Act, that "for purposes of the Indian Gaming Regulatory Act . . . , settlement lands shall not be treated as Indian lands"). Alternatively, Congress could

have amended Section 20 of IGRA to account for after-acquired restricted fee lands at the same time that it enacted the SNSA. Congress, however, chose to do neither. There is therefore no indication that Congress intended lands that pass into restricted fee pursuant to the SNSA to be subject to Section 20 of IGRA.

For these reasons, we hold that the Buffalo Parcel is not subject to Section 20's gaming prohibition. We therefore affirm the district court's decision in *CACGEC III* and hold that neither the DOI nor the NIGC acted arbitrarily or capriciously, abused their discretion, or acted in violation of law in concluding that Section 20 did not apply to the Buffalo Parcel. Because we uphold the NIGC's approval of the Seneca Nation's most recent gaming ordinance, and that ordinance superseded the ordinances at issue in *CACGEC I* and *CACGEC II*, we conclude that the appeals and cross-appeal[17] of those earlier decisions are moot.

---

[17] The defendants cross-appealed the district court's grant of summary judgment in *CACGEC II*, including the court's determination that the "settlement of a land

-67-

**CONCLUSION**

The district court in *CACGEC III* correctly dismissed the plaintiffs' complaint because the DOI and the NIGC's determination that the Buffalo Parcel is eligible for class III gaming under IGRA was not arbitrary or capricious, an abuse of discretion, or in violation of law. Congress intended lands that attain restricted fee status under the SNSA to be subject to tribal jurisdiction, as required by IGRA. Finally, IGRA Section 20's prohibition of gaming on trust lands acquired after IGRA's enactment does not apply to the Buffalo Parcel. Because the gaming ordinances at issue in *CACGEC I* and *CACGEC II* have been superseded by the most recent amended ordinance at issue in *CACGEC III*, the appeals of *CACGEC I* and *CACGEC II* are moot. The court has considered the plaintiffs' other arguments and found them to be without merit. Accordingly, we

claim" exception did not apply to the Buffalo Parcel. The defendants conceded at oral argument that we need not reach this issue if we conclude that Section 20's prohibition does not apply to restricted-fee lands. Because we hold that the Buffalo Parcel is not subject to Section 20, there is no need to address the applicability of the "settlement of a land claim" exception.

**AFFIRM** the judgment of the district court in *CACGEC III* and dismiss the appeals of *CACGEC I* and *CACGEC II*.